IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CARLIN ROBINSON, ET AL. | * | |
| v. | * | Civil No. CCB-12-192 |
| DANIEL A. LIOI, ET AL. | * | |

\*\*\*\*\*\*

## MEMORANDUM

This case arises from the November 2008 murder of Veronica Williams ("Ms. Williams") by her husband, Cleaven Lawrence Williams, Jr. ("Mr. Williams"). Mr. Williams stabbed Ms. Williams outside a Baltimore court following that court's grant of her request for a protective order against Mr. Williams. Although Ms. Williams had filed assault charges against Mr. Williams several weeks earlier, the Baltimore City Police Department ("BCPD") did not serve the arrest warrant on him. Carlin Robinson ("Ms. Robinson"), as Guardian and Next Friend of Ms. Williams's children, and Eunice Graves ("Ms. Graves"), Ms. Williams's mother (collectively, "the plaintiffs"), initially filed this civil suit against Mr. Williams, the BCPD, and Daniel A. Lioi ("Lioi"), a Deputy Major of the BCPD's Eastern District. The plaintiffs filed an amended complaint after this court dismissed their claims against the BCPD, adding as a defendant Melvin Russell ("Russell"), a BCPD Major. The plaintiffs alleged that due to their prior relationship with Mr. Williams, Russell and Lioi departed from normal procedures in serving the arrest warrant, thereby enabling Mr. Williams to remain free at the time he killed his wife.

1

The plaintiffs have asserted claims against defendants for violating Ms. Williams's due process rights under 42 U.S.C. § 1983, and for conspiring to violate Ms. Williams's constitutional rights under 42 U.S.C. § 1985. They also have asserted state law tort claims for wrongful death, survival action, battery, gross negligence, reckless endangerment, intentional infliction of emotional distress, common law conspiracy, conversion, fraud, and intentional misrepresentation. Now pending are Lioi's and Russell's Motions for Summary Judgment (ECF No. 144; ECF No. 146), plaintiffs' Motion to Strike Lioi's Motion for Summary Judgment (ECF No. 153), and Lioi's Cross-Motion to Modify Scheduling Order (ECF No. 166). The motions have been fully briefed, and no oral argument is necessary. *See* Local R. 105.6 (D. Md. 2016). For the reasons set forth below, plaintiffs' Motion to Strike will be denied, Lioi's Cross-Motion to Modify Scheduling Order will be granted, and defendants' Motions for Summary Judgment will be granted.

## BACKGROUND

The uncontested facts are as follows. Mr. and Ms. Williams lived with their three young children in Baltimore, Maryland. (Pl. Opp'n at p. 5, ECF No. 175–1). Mr. Williams served as the president of the Greater Greenmount Community Association. (Russell Mot. Summ. J. at p. 7, ECF No. 144–1).[1] It was in this capacity that Mr. Williams first met Russell and Lioi; their interactions were limited to joint participation in several "community meetings" and "community walks." (*Id.*) On Sunday, November 9, 2008, Ms. Williams filed for and was granted a protective order against Mr. Williams for "second-degree assault and unauthorized removal of property arising out of an October incident where Mr. Williams assaulted her by pinning her down and using a pair of scissors to cut off her hair." (*Id.* at p. 5–6). A warrant was then issued

---

[1] Lioi "expressly incorporates by reference" the undisputed facts as set forth in pp. 5–14 in Russell's Motion for Summary Judgment. (Lioi Mot. Summ. J. at p. 3, ECF No. 146–1).

for Mr. Williams's arrest in connection with the October incident. (Arrest Warrant, ECF No. 144–3, Ex. 1). At approximately 11:30 p.m. on Sunday, November 9, 2008, BCPD Officer Jose Arroyo, following instructions from a dispatcher, picked up the arrest warrant from the Court Commissioner. (Russell Mot. Summ. J. at p. 6, ECF No. 144–1). Despite the fact that arrest warrants are generally first brought to "central records" for logging unless the warrant requires "immediate service" or the subject of the warrant is in custody (Arroyo Dep. 47:6–19, ECF No. 175–8, Ex. 6; ECF No. 174–12, Ex. 10),[2] neither of which was the case here, Officer Arroyo returned to the Eastern District with the warrant without first stopping at "central records." (*Id.* at 58:22–59:8). While it is possible Officer Arroyo bypassed bringing the warrant to "central records" upon the orders of a superior officer, Officer Arroyo does not recall if Russell, Lioi, or any other superior officer issued any such order. (Arroyo Dep. 47:6–20, 49:11–54:2, ECF No. 175–8, Ex. 6). Officer Arroyo had no further involvement with the arrest warrant or with Mr. Williams, Russell, or Lioi after bringing the warrant to the Eastern District. Over the next several days, officers may have attempted to serve the warrant on Mr. Williams by "turning up" at his residence; if these "turn-ups" were indeed occurring, however, officers were unsuccessful

---

[2] Russell disputes the fact that "fresh warrants . . . hot right off the presses," are generally brought to central records first. Instead, he suggests warrants are brought directly to the district where the warrant is to be served and that warrants are later brought to central records only if patrol officers fail to serve the warrant for several days. (Russell Dep. 78:15–81:6, ECF No. 175–4, Ex. 4). BCPD General Order K-4 does not entirely clarify; it states:

> "If the arrest warrant must be served immediately, have the warrant logged in the district where the offense occurred. However, if a warrant does not require immediate service the warrant will be forwarded to the Central Records Division by the Court Commissioner, where the appropriate administrative controls will be initiated for the warrant."

(ECF No. 175–9, Ex. 7).

in locating Mr. Williams and serving the warrant.[3] (Internal Incident Report, ECF No. 175–10, Ex. 8).

Russell eventually learned about the warrant on or about Monday, November 10, 2008. (Russell Dep. 69:11–70:22, ECF No. 175–4, Ex. 2). On that day, Mr. Williams sent the following text to Mr. Russell: "Call me, major." (Mr. Williams's Texts at p. 5, ECF No. 175–6, Ex. 4). Two days later, on Wednesday, November 12, 2008, around 3:20 p.m., Mr. Williams texted Russell regarding turning himself in, stating: "I would really like to do it on Tuesday[.] I am still trying to get capital[.] I only have $3,000 right now[.] I have some favors coming through." (*Id.* at p. 6). At deposition, Mr. Williams explained that he wanted to turn himself in on Tuesday after speaking with his lawyers, who advised "him not to turn [him]self in on a . . . Friday or Monday." (Mr. Williams Dep. 36:9–37:15, ECF No. 144–8, Ex. 6). Later that Wednesday afternoon, Russell informed Lioi that Mr. Williams had an arrest warrant out for "common assault." (Lioi Dep. 79:1–81:22, ECF No. 174–3, Ex. 1). Russell informed Lioi that Mr. Williams was scheduled to turn himself in the next day, Thursday, November 13, 2008, at 9:00 p.m., and asked if Lioi could be present. (*Id.* at 82:2–14). Russell made this request because he was working the day shift from 9:00 a.m. to 5:00 p.m., and Lioi was covering the night shift, which typically ran from 2:00 p.m. until 10:00 p.m. at night. (*Id.* at 80:18–81:2).

On Thursday, November 13, at approximately 1:00 p.m., Mr. Williams sent Russell a text stating: "I am running behind. I should be there in 15." (Mr. Williams's Texts at p. 7, ECF No. 175–6, Ex. 4). In response, Russell replied: "K." (*Id.*) At this time, Russell did not inform Lioi

---

[3] The parties dispute whether these "turn-ups" occurred. Russell contends multiple turn-ups occurred, and that he himself attempted to personally serve the warrant. (Russell Mot. Summ. J. at p. 9, ECF No. 144–1). Conversely, plaintiffs contend it is equally likely that "the turn-ups were not being conducted at all." (Robinson Opp'n at p. 15–16, ECF No. 175–1). In any event, what is uncontested is that the warrant was not successfully served at this time.

that he was in contact with Mr. Williams. (Lioi Dep. 264:10–267:2, ECF No. 174–3, Ex. 1).

This 1:00 p.m. text exchange occurred roughly eight hours before Mr. Williams eventually

turned himself in at the Eastern District at 9:00 p.m. When asked at deposition regarding this

text exchange, Russell indicated his belief that Mr. Williams was referencing his intent to

"com[e] to the station" to turn himself in during the time Russell was working. (Russell Dep.

210:17–21, ECF No. 175–4, Ex. 2). Specifically, Russell stated he "didn't meet [Mr. Williams]

or make any arrangement to meet [Mr. Williams] outside of [Mr. Williams] turning himself in,"

and that Mr. Williams must have "never show[n] up" around 1:15 p.m. as suggested in the text

message. (*Id.* at 214:11–215:2, 210:17–21).

At approximately 9:00 p.m. on Thursday, November 13, 2008, Mr. Williams arrived at

the Eastern District to turn himself in. (Russell Mot. Summ. J. at p. 11, ECF No. 144–1;

Robinson Opp'n at p. 10, ECF No. 175–1). Mr. Williams stated at deposition that he went to the

Eastern District that night believing he would be incarcerated and released the following

morning on Friday, November 14, 2008. (Mr. Williams Dep. 42:21–43:13, ECF No. 144–8, Ex.

6). When Mr. Williams arrived, Lioi and another officer inquired with "central records"

regarding Mr. Williams's arrest warrant because that is where warrants generally are stored.

(Lioi Dep. 115:12–22, ECF No. 174–3, Ex. 1). Central records, however, did not have a copy of

the warrant because Officer Arroyo had brought it directly to the Eastern District without first

stopping at central records. After checking with central records, Lioi made various inquiries to

the commissioner's office, the sheriff's office, and the North Avenue courthouse to locate the

warrant. (*Id.* at 116:5–117:5). After a period of time,[4] realizing that central booking would not

---

[4] Lioi estimated this period of time was approximately "an hour and a half" at deposition. (Lioi
Dep. 116:14–22, ECF No. 174–3, Ex. 1). However, during a 2008 Internal Affairs investigation,
Lioi estimated the time was between twenty or thirty minutes. (Lioi Internal Affairs Statement at

accept Mr. Williams without a warrant, and acknowledging the warrant might not be located in a timely manner, Lioi allowed Mr. Williams "to leave [the station] with the agreement that he would come back" once the warrant was located. (Russell Dep. 115:1–5, ECF No. 175–4, Ex. 2). The warrant was eventually located "a little after midnight," on Friday, November 14, 2008, in the patrol car of Officer Adrienne Byrd, who had attempted to serve the warrant during the previous shift. (Sgt. Todd Tugya Aff. ¶¶ 4–5, ECF No. 144–12, Ex. 10). Despite finding the warrant the morning of Friday, November 14, 2008, Russell and Lioi authorized Mr. Williams to turn himself in on Tuesday, November 18, 2008. (Lioi Dep. 221:19–223:17, ECF No. 174–3, Ex. 1).

On Friday, November 15, 2008, Lioi issued a letter, at Mr. Williams's request, explaining that although Mr. Williams had been "very cooperative and willing to turn himself in," he was not ultimately arrested because the police did not have his warrant on file. (Lioi Dep. 228:1–18, ECF No. 174–3, Ex. 1; *see also* ECF No. 175–11, Ex. 9). Later, on Sunday, November 16, 2008, Mr. Williams informed Lioi that there was a separate assault warrant from March 7, 2003, for a Maryland resident named "Cleaven Williams." (Lioi Dep. 228:19–229:2, ECF No. 174–3, Ex. 1). At Mr. Williams's request, Lioi issued a second letter indicating this earlier warrant for a "Cleaven Williams" "is very limited and should not be considered to be [Mr. Williams] based on the name alone."[5] (*Id.* at 234:10–235:16; *see also* ECF No. 175–12, Ex. 10). These letters, according to Mr. Williams, were requested from Lioi because Mr. Williams's lawyers told him

p. 3, ECF No. 175-7, Ex. 5). Russell characterized this simply as a "lengthy period of time." (Russell Dep. 115:1–5, ECF No. 175–4, Ex. 2).

[5] The other warrant from March 7, 2003, was for Mr. Williams, but this was determined "[a]fter the fact." (Lioi Dep. 236:22–237:11, ECF No. 174–3, Ex. 1). Regardless, the letter Lioi issued never affirmatively stated Mr. Williams was not the subject of the warrant, but rather that Mr. Williams should not be presumed to be the same Cleaven Williams from the March 2003 warrant based on name alone.

they would be "beneficial" to obtain. (Mr. Williams Dep. 154:19–155:20, ECF No. 144–8, Ex. 6). Neither of these two letters "was ever presented by [Mr.] Williams to, or considered by, a judge, Commissioner, or any third party." (Lioi Mot. Summ. J. at p. 4, ECF No. 146–1).

On Monday, November 17, 2008, Mr. Williams and Lioi had the following text exchange:

> **Mr. Williams:** "Cool . . . I just left my home 2 meet w/my lawyer . . . I saw my wife drive by . . . can I go home or what?"
> . . .
> **Lioi:** I wouldn't be alone with her. She could say you did anything. Have a witness with you if you meet.
> **Mr. Williams:** Thanks Dan . . . Can she do another protection order & try 2 keep me from the house?
> **Lioi:** She could. I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.

(Mr. Williams's Texts at p. 9, ECF No. 175–6, Ex. 4).

Ultimately, Mr. Williams did not turn himself in on Tuesday, November 18, 2008. Rather, Mr. Williams travelled to a Baltimore District Court on Monday, November 17, 2008, where Ms. Williams was seeking a protective order against him. Mr. Williams attacked Ms. Williams outside the courthouse, stabbing her repeatedly and ultimately killing her and their unborn child in the process. (Pl. Opp'n at p. 17, ECF No. 175–1); *State v. Williams*, Case No. 108350013 (Cir. Ct. Balt. City Feb. 25, 2011); *State v. Williams*, Case No. 11-0672 (Ct. Spec. App. April 5, 2013) (affirming conviction). Mr. Williams was found guilty and sentenced to life in prison. (*Id.*)

The plaintiffs commenced this action on November 15, 2011, by filing a complaint in the Circuit Court for Baltimore City, Maryland. The defendants removed the case to this court on January 19, 2012. On July 18, 2012, the court denied Mr. Lioi's motion to dismiss but granted the BCPD's motion to dismiss the claims against it. The Fourth Circuit affirmed in an

7

unpublished decision. *Robinson v. Lioi*, 536 Fed. App'x 340 (2013), *cert. denied*, 134 S. Ct. 1515 (2014). On June 12, 2014, the plaintiffs filed an amended complaint adding Mr. Russell as a defendant. The amended complaint included claims against defendants for violating Ms. Williams's due process rights under 42 U.S.C. § 1983 (Count I), and for conspiring to violate Ms. Williams's constitutional rights under 42 U.S.C. § 1985 (Count III). (Am. Compl., ECF No. 87). It also contained state law tort claims for wrongful death (Count IV), survival action (Count V), battery (Count VI), gross negligence (Count VII), reckless endangerment (Count VIII), intentional infliction of emotion distress (Count IX), common law conspiracy (Count X), conversion (Count XI), and fraud and intentional misrepresentation (Count XII). (*Id.*). On September 22, 2016, Russell and Lioi each filed a motion for summary judgment on Counts I, III–V, and VII–X. (Russell Mot. Summ. J., ECF No. 144; Lioi Mot. Summ. J., ECF No. 146). The plaintiffs opposed the motions (Robinson Opp'n, ECF No. 174; Robinson Opp'n, ECF No. 175), and Russell and Lioi filed responses. (Russell Resp., ECF No. 182; Lioi Resp., ECF No. 186). [6]

## LEGAL STANDARD

The case was removed to this court pursuant to 28 U.S.C. 1441(c) because plaintiffs' § 1983 claims are founded in federal law and arise under the laws of the United States within the meaning of 28 U.S.C. § 1331. Accordingly, this court has federal question jurisdiction. *See* 28 U.S.C. § 1331.

---

[6] Count II alleging a violation of § 1983 against the BCPD was previously dismissed by this court. (ECF No. 24). Mr. Williams had not filed a Motion for Summary Judgment; the claims against Mr. Williams include: Count III alleging conspiracy; Count IV alleging wrongful death; Count V alleging survival action; Count VI alleging battery; Count VII alleging gross negligence; Count VIII alleging reckless endangerment; Count IX alleging IIED; Count X alleging common law conspiracy; Count XI alleging conversion; and Count XII alleging fraud and intentional misrepresentation.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.' " *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, — U.S. —, 134 S.Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L. Ed. 2d 686 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I.    Plaintiffs' Motion to Strike Lioi's Motion for Summary Judgment

Plaintiffs move to strike Lioi's motion for summary judgment, arguing that Lioi's motion was untimely filed. Plaintiffs note that on May 5, 2014, this court granted a "Joint Motion to Modify Scheduling Order" and set the deadline for filing dispositive motions as September 14, 2014. (Robinson Mot. to Strike ¶ 3, ECF No. 153). The scheduling order was modified on five

9

separate occasions. (*Id.* at ¶¶ 4–10). The motions to modify the scheduling orders contained language stating: "Defendant Dan Lioi joins this motion with respect to the extension of the discovery deadline for all parties and intends to submit a separate motion regarding the deadline for dispositive motions." (*Id.* at ¶¶ 6–9). Despite this language, Lioi failed to file a motion to extend his deadline for dispositive motions, but nonetheless filed his Motion for Summary Judgment on September 22, 2016. (*Id.* at ¶ 12). Subsequently, plaintiffs filed the instant Motion to Strike Lioi's Motion for Summary Judgment on October 12, 2016. (Robinson Mot. to Strike, ECF No. 153).

Lioi argues he was not required to file a motion to modify the scheduling order because he can file a dispositive motion "after the close of all discovery." (Lioi Opp'n ¶¶ 2–3, ECF No. 166). Lioi further contends the matter was complicated when Russell was formally added to the case, because Lioi did not "contemplate . . . [the need] to file a separate formal motion to modify the scheduling order to extend the date for dispositive motions from September 17, 2014." (*Id.* at ¶ 7). Furthermore, Lioi argues his motion did not prejudice plaintiffs because he had advised the "Court and the parties of [his] intention to file a dispositive motion in this case, including in all Status Reports to the Court." (*Id.* at ¶ 5). For example, on February 5, 2014, Lioi submitted a status report to this court stating "[a]s of February 3, 2014, Defendant does intend to file a dispositive pre-trial motion." (Lioi Status Rept. at p. 2, ECF No 73). Lastly, in the alternative, Lioi "cross-moves to modify the Scheduling Order to [extend his filing deadline for dispositive motions] on or before September 22, 2016, the same deadline accorded to Defendant Melvin Russell, with whom Lioi is, in all material respects, similarly situated." (Lioi Opp'n ¶ 13, ECF No. 166).

Plaintiffs' argument has merit; defendant Lioi should have been aware of the filing deadlines and language contained in the modified scheduling orders. Accordingly, he should have filed a motion to extend the deadline for his dispositive motions prior to filing his Motion for Summary Judgment. Indeed, the language contained in the numerous Joint Motions to Modify Scheduling Order is clear: "Defendant Dan Lioi . . . intends to submit a separate motion regarding the deadline for dispositive motions." (*See, e.g.*, Joint Mot. to Modify Sch. Order ¶ 3, ECF No. 137). Nonetheless, defendant Lioi's Cross-Motion to Modify Scheduling Order will be granted. Despite their arguments to the contrary, plaintiffs have not been prejudiced by Lioi's filing. Plaintiffs received "multiple extensions of time to respond" to Lioi's motion, and the motion has been fully briefed. (Lioi Resp. ¶¶ 3–4, ECF No. 179). Lioi is, as he argues, similarly situated to Russell, and it should not have been a surprise that Lioi intended to file a dispositive motion, given that Lioi had stated his intention in status reports. Accordingly, plaintiffs' Motion to Strike will be denied, Lioi's Cross-Motion will be granted, and the court will consider Lioi's Motion for Summary Judgment.

## II.   State-Created Danger Doctrine

"Section 1983 imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Doe v. Rosa*, 795 F.3d 429, 436 (4th Cir. 2015), *cert. denied sub nom. John Doe 2 v. Rosa*, 136 S. Ct. 811 (2016). "Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Id.* at 436–37 (citing *Hall v. Tawney*, 621 F.2d 607, 612–13 (4th Cir. 1980)). However, "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. of Dep't of Soc. Servs.*, 489

U.S. 189, 197 (1989). Indeed, liability of state actors is significantly limited, as the Supreme

Court explained in *DeShaney*:

> [N]othing in the language of the Due Process Clause itself requires the State to
> protect the life, liberty, and property of its citizens against invasion by private
> actors. The Clause is phrased as a limitation on the State's power to act, not as a
> guarantee of certain minimal levels of safety and security. It forbids the State
> itself to deprive individuals of life, liberty, or property without "due process of
> law," *but its language cannot fairly be extended to impose an affirmative*
> *obligation on the State to ensure that those interests do not come to harm through*
> *other means.* Nor does history support such an expansive reading of the
> constitutional text. Like its counterpart in the Fifth Amendment, the Due Process
> Clause of the Fourteenth Amendment was intended to prevent government from
> abusing [its] power, or employing it as an instrument of oppression[.] Its purpose
> was to protect the people from the State, not to ensure that the State protected
> them from each other.

*Id.* at 195 (emphasis added) (internal citations and quotation marks omitted). Accordingly, the

Supreme Court has noted "state actor liability might attach in two narrow circumstances." *Rosa*,

795 F.3d at 437. The first exception, "when the State takes a person into its custody and holds

him there against his will," is not at issue here.[7] *Id.* (citing *DeShaney*, 489 U.S. at 199–200).

Rather, at issue is the second exception, the "state-created danger exception," which arises

"[w]hen the state itself creates the dangerous situation that resulted in a victim's injury." *Id.* at

438 (citing *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995)). "In such instances, the state

is not merely accused of a failure to act; it becomes much more akin to an actor itself directly

causing harm to the injured party." *Pinder*, 54 F.3d at 1177. It should be noted, however, that

this state-created danger exception is a narrow exception requiring some affirmative action, and

not inaction, attributable to the state, creating or enhancing the danger; "[i]t cannot be that the

state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes

---

[7] This court already decided the first exception does not apply because "[e]ven drawing all
inferences in favor of Ms. Williams as the non-moving party, the court sees no evidence that Ms.
Williams faced 'a restraint of personal liberty . . . triggering the protections of the Due Process
Clause.'" (ECF No. 24, pp. 8–9) (citing *DeShaney*, 489 U.S. at 200).

injury at the hands of a third party more likely." *Id.* at 1175. Furthermore, "[w]hile it is true that inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff." *Id.* at 1176, fn 1.

The leading Fourth Circuit case regarding the state-created danger doctrine, as applicable here, is *Pinder v. Jonhnson.* 54 F.3d 1169 (4th Cir. 1995). There, Carol Pinder brought a § 1983 action "seek[ing] to impose civil liability against Officer Donald Johnson of the Cambridge, Maryland, Police Department for his failure to safeguard her children from the criminal depredations of plaintiff's ex-boyfriend." *Id.* at 1171–72. Officer Johnson had responded to a call reporting a domestic disturbance stemming from an incident where Ms. Pinder's former boyfriend, Don Pittman, had broken into her home. *Id.* at 1172. Ms. Pinder told Officer Johnson that Mr. Pittman had been "abusive and violent," and that he had "pushed her, punched her, and threw various objects at her." *Id.* Ms. Pinder also told Officer Johnson that Mr. Pittman had threatened "both Pinder and her children, saying he would murder them all." *Id.* Officer Johnson arrested Mr. Pittman and informed Ms. Pinder she could return to work that evening because "Pittman would be locked up overnight." *Id.* Officer Johnson ultimately filed lesser charges against Mr. Pittman, who was released from custody that same night. *Id.* Mr. Pittman then returned to Ms. Pinder's home and set fire to it; Ms. Pinder's three children, who were home asleep, died of smoke inhalation. *Id.* The Fourth Circuit rejected Ms. Pinder's attempts to characterize Officer Johnson's "actions"—including making assurances to Ms. Pinder and charging Mr. Pittman with a lesser charge—as "*affirmative* misconduct." *Id.* at 1175. Accepting such an argument, the Fourth Circuit concluded, would ensure that "every representation by the

13

police and every failure to incarcerate would constitute 'affirmative actions,' giving rise to civil liability." *Id.* And although the Fourth Circuit acknowledged that "at some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused," "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by Pittman, not by Officer Johnson." *Id.* Accordingly, finding Pinder's case to be "purely an omission claim," the Fourth Circuit found Officer Johnson was entitled to qualified immunity. *Id.* at 1176, 1179.

In a more recent case, *Doe v. Rosa*, the Fourth Circuit upheld the district court's grant of summary judgment in favor of the defendant. *Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015), *cert. denied sub nom. John Doe 2 v. Rosa*, 136 S. Ct. 811, 193 L. Ed. 2d 715 (2016). There, the Does alleged a § 1983 violation against John W. Rosa, president of The Citadel, The Military College of South Carolina, for allegedly covering up complaints that Louis ReVille, a camp counselor, was sexually abusing minor camp attendees. *Id.* at 436. Rosa's "actions" in failing to report the complaints, the plaintiffs argued, allowed ReVille to remain free and continue abusing other minors. *Id.* In concluding the Does could not establish a § 1983 state-created danger claim against Rosa, the Fourth Circuit noted that the abuser, Louis ReVille, had been abusing the Does for years before Rosa became aware that he was a pedophile, and therefore Rosa "could not have created a danger that already existed." *Id.* at 439 (citing *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir.1998)). The court also found Rosa did not "create or increase the risk of the Does' abuse," because "allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger." *Id.* Furthermore, the court found that Rosa's failure to report the complaints regarding ReVille to the Citadel police or to a Title IX agency could not constitute an "affirmative act"; rather, the claim against

14

Rosa was rather "purely an omission claim," and "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [ReVille], not by [Rosa]." *Id.* at 441 (citing *Pinder*, at 1175–76).

### III.   Russell's and Lioi's § 1983 Liability

Russell and Lioi argue that plaintiffs' § 1983 claim must fail because Russell and Lioi did not commit any affirmative acts that created or enhanced the danger to Ms. Robinson. This court previously denied Lioi's Rule 12(b)(6) motion to dismiss, and the United States Court of Appeals for the Fourth Circuit affirmed the judgment in an unpublished decision, *Robinson v. Lioi*. 536 F. App'x 340 (4th Cir. 2013). At the 12(b)(6) stage, this court and the Fourth Circuit accepted as true all material facts alleged in plaintiffs' complaint, and drew all reasonable inferences in plaintiffs' favor. The Fourth Circuit stressed certain affirmative acts alleged in the complaint, including that Lioi, *inter alia*: (1) "conspired with Cleaven Williams" to help him avoid arrest, (2) "actively interfered with the execution of the warrant by . . . failing to turn the warrant over to the proper unit with[in] the BCPD responsible for its execution," (3) warned "Mr. Williams and g[ave] him advice about how to avoid service of the warrant," and (4) "lied to avoid service of the arrest warrant by falsely contending that it could not be found." *Id.* at 344. The Fourth Circuit found these alleged acts amounted to "more than a mere passive failure to act," *id.*, that "affirmatively placed [Mrs. Williams] in a position of danger," *id.* at 345.

However, at the summary judgment stage of litigation, plaintiffs' allegations must be supported by admissible evidence. Plaintiffs have not proffered sufficient evidence of a conspiracy, of any active interference with the warrant process, or of Russell or Lioi advising Mr. Williams on how to avoid service. Rather, as discussed below in further detail, I find that Russell and Lioi are entitled to summary judgment because they did not: (a) commit any

15

"affirmative acts," that (b) "created or enhanced the danger" to Ms. Robinson. Additionally, Russell and Lioi are entitled to qualified immunity, as discussed in Section IV, *infra*.

### A. Affirmative Acts

Defendants Russell and Lioi argue that this is a case of "inaction," and that their actions amount to a "failure to guarantee the arrest and detention (for an unspecified period of time) of Mr. Williams on November 13, 2008." (Russell Mot. Summ. J. at p. 19, ECF No. 144–1). The record supports the defendants' contention that this is an omission claim, as in *Pinder* and *Rosa*, rather than "affirmative acts" of the type that could result in liability.

First, while there is evidence that defendants texted and conversed with Mr. Williams between Sunday, November 9, 2008, and Monday, November 17, 2008, defendants primarily were coordinating the date and logistics of Mr. Williams's voluntary surrender, and indeed on November 17, 2008, advised him to avoid interactions with his wife. These messages—when viewed in conjunction with the fact Mr. Williams was not only willing to surrender himself . voluntarily, but that he attempted to do so on Thursday, November 13, 2008— suggest that defendants merely used their discretion and best judgment to allow Mr. Williams to select a later date of self-surrender.

Second, plaintiffs have failed to present sufficient evidence to show that Russell or Lioi were themselves responsible for any of the alleged deficiencies with the warrant process. The . fact that the physical warrant was misplaced when Mr. Williams attempted to surrender himself on Thursday, November 13, 2008, and later found in Officer Adrienne Byrd's patrol car, does not suggest Lioi purposely hid the warrant or prevented Mr. Williams's arrest. Moreover, even if Mr. Williams had been arrested that night, he likely would have been released within twenty-four

16

hours, as discussed in further detail *infra*, which would have provided Mr. Williams the same opportunity to murder his wife on Monday, November 17, 2008.

The Supreme Court's decision in *Town of Castle Rock, Colo. v. Gonzales,* where the Court stated a "warrant . . . remains within the discretion of the police whether and when to execute it," is instructive. 545 U.S. 748, 764 (2005). While *Castle Rock* concerned an alleged procedural, rather than substantive, due process violation, the Court also acknowledged that "the benefit that a third party may receive from having someone else arrested for a crime *generally does not trigger protections under the Due Process Clause*, neither in its procedural nor in its 'substantive' manifestations." *Id.* at 768. The Court continued, stating "the Fourteenth Amendment . . . did not create a system by which police departments are generally held financially accountable for crimes that better policing might have prevented." *Id.* at 768–69. This is precisely what plaintiffs seek to do here by holding Russell and Lioi liable for not having Mr. Williams arrested, suggesting that "better policing" might have prevented Ms. Williams's murder.

Furthermore, as the court stated in *Pinder*, "[w]hile it is true that inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' *beyond the context of immediate interactions between the officer and the plaintiff.*" *Pinder*, 54 F.3d at 1176, fn. 1 (emphasis added). Here, neither Russell nor Lioi had *any* "immediate interactions" with Ms. Williams. Ultimately, this case is governed by *Pinder* and *Rosa*, and based on the evidence, Russell and Lioi's conduct never reached the "point on the spectrum between action and inaction, [where] the state's conduct [] implicate[s] it in the harm caused." *Pinder*, 54 F.3d at 1175.

## B. Creating or Enhancing the Danger to Ms. Williams

Even if Russell and Lioi's conduct constitutes "affirmative acts," however, plaintiffs would still need to demonstrate these acts "created or substantially enhanced the danger which resulted" in Ms. Williams death. *Rosa*, 795 F.3d at 439. They have failed to do so.

Plaintiffs argue that Russell and Lioi's failure to arrest Mr. Williams—either on Thursday, November 13th, 2008, or at some time prior to the murder—directly caused Ms. Williams's death by allowing Mr. Williams to remain free until he murdered his wife. To support their argument, they selectively cite to portions of Russell and Lioi's deposition testimony. For example, plaintiffs cite to a section of Lioi's deposition testimony where Lioi stated: "If [Mr. Williams had] been arrested *at that time*, then yeah, he probably wouldn't have had that window of opportunity right then [to murder his wife]." (Lioi Dep. 308:20–309:4, ECF No. 174–3, Ex. 1) (emphasis added). However, the "time" Lioi mentions during this portion of his deposition testimony is the morning of the murder on Monday, November 17, 2008. *Id.* Of course if Mr. Williams had been arrested on the day of the murder, he would not have had that specific opportunity to murder his wife. However, it does not follow from Lioi's statement at deposition that any act of Lioi's created or enhanced the danger to Ms. Williams. Indeed, Lioi could not have arrested Mr. Williams that day because he did not know Mr. Williams's exact location; there was also no known urgency to do so because Mr. Williams was scheduled to turn himself in the next day.[8] Similarly, plaintiffs cite to a portion of Russell's deposition testimony where Russell expressed he was "very grievous" when he saw Ms. Williams's slain body

---

[8] Plaintiffs, on several occasions, argue that Russell or Lioi knew Mr. Williams's "exact location" and failed to execute the warrant. (*See, e.g.*, Pl. Opp, at p. 25, fn. 28, ECF No. 141–1) ("This text message also represents yet another time in which either Major Russell or Deputy Major Lioi knew of Mr. Williams's location and failed to execute his warrant."). However the texts that plaintiffs reference never actually provide Mr. Williams's "exact location." *Id.*

because if "[Mr. Williams] had been arrested then, you know, Veronica would probably still be with us." (Russell Dep. 140:2–22, ECF No. 175–4, Ex. 2).

Cutting against plaintiffs' argument is the Fourth Circuit's language in *Doe v. Rosa*, where the court clarified that "allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger." *Rosa*, 795 F.3d at 439. There is little doubt that Mr. Williams posed an "existing danger" to Ms. Williams given his earlier abuse of Ms. Williams. Furthermore, there is no doubt that the ultimate act of murder was carried out by Mr. Williams, and not by defendants Russell and Lioi.

Additionally, plaintiffs' argument that Russell or Lioi created or enhanced the danger to Ms. Williams by failing to ensure Mr. Williams's arrest on or prior to his original date of voluntary surrender, Thursday, November 13, 2008, is speculative at best. Indeed, defendants provide compelling evidence that even if they had arrested Mr. Williams on Thursday, November 13, 2008, "the holding period on a misdemeanor warrant for second-degree assault is likely to be less than 24 hours." (Russell Mot. Summ. J. at p. 23, ECF No. 144–1; Stanford O'Neill Franklin Aff. ¶¶ 51–53, ECF No. 144–13, Ex. 11). Stanford O'Neill Franklin, an officer with thirty-four years of law enforcement experience, submitted an affidavit stating that if Mr. Williams had been arrested, "it is reasonable to believe [Mr. Williams] would have been released within 24 hours on his personal recognizance," because "an established member of the community with local ties, no violent criminal history and no apparent danger to society is [generally] released on [his] personal recognizance." (Stanford O'Neill Franklin Aff. ¶¶ 53, ECF No. 144–13, Ex. 11). Even if Mr. Williams were forced to post bail, Franklin also attested that in the context of "misdemeanor assault arrests," he "never experienced an arrestee receiving a bail too high, preventing immediate posting." *Id.* Therefore, Mr. Williams likely would have been

free to murder his wife the following Monday. Additionally, it is highly speculative to suggest that Monday, November 17, 2008, was Mr. Williams's *only* opportunity to attack his wife, as plaintiffs contend. Indeed, at deposition Mr. Williams suggested that he knew where his wife was because he had "sent her to Carlin [Robinson's] house" and he knew "where she lived at." (Mr. Williams Dep. 148:14–149:13, 144–8, Ex. 6).

Ultimately, plaintiffs have failed to establish that Russell or Lioi committed affirmative acts that created or enhanced the danger to Ms. Williams. Accordingly, Russell and Lioi are entitled to summary judgment on plaintiffs' § 1983 state-created danger claim in Count I.

### IV.    Qualified Immunity

In the alternative, Russell and Lioi argue that they are entitled to qualified immunity because, *inter alia*, "it was not clearly established in 2008 that a supervisory police officer's reasonable exercise of discretion in attempting to facilitate a citizen's voluntary surrender would violate the constitutional rights of his murder victim." (Russell Mot. Summ. J. at p. 27, ECF No. 144–1; Lioi Mot. Summ. J. at p. 13, ECF No. 146–1). Government actors, such as defendants Russell and Lioi, are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.' *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992)). Furthermore, qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In determining whether qualified immunity applies, courts previously were required to follow a "two-step sequence"; they decided first "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and second, "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct." *Id.* at 232. Courts now have the discretion, however, to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The second prong, "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct," *Pearson*, 555 U.S. at 232, requires the right to be "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft*, 563 U.S. at 741). "Existing precedent" does not, however, require a case directly on point. *United States v. Lanier*, 520 U.S. 259, 271 (1997) ("The easiest cases don't even arise."). "In the end, the lodestar for whether a right was clearly established is whether the law gave the officials fair warning that their conduct was unconstitutional." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Ridpath v. Bd. Of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)) (internal citations and quotation marks omitted).

Even if the analysis in Section III is incorrect, and the plaintiffs' proffered evidence is sufficient to prove a constitutional violation, the facts are not sufficient to show that a reasonable officer in either defendant's position would have understood he was violating that right.

Russell's and Lioi's actions, when viewed in sum, amount to using their discretion not to aggressively serve an arrest warrant and instead allow Mr. Williams to delay his date of voluntary surrender by several days.[9] A reasonable police officer in Lioi and Russell's position could not have known that the failure to guarantee Mr. William's arrest on a misdemeanor warrant prior to November 17, 2008, would violate Ms. Williams's constitutional rights.

### A. Conspiracy (Counts 3 and 10)

Plaintiffs allege Russell, Lioi, and Mr. Williams conspired to violate Ms. Williams rights pursuant to 42 U.S.C. § 1985 and the common law.[10] "Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005)). Furthermore, "[i]n addition to proving an agreement, 'the plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Id.* (citing *Hoffman*, A.2d at 290). In comparison, to establish a claim under 42 U.S.C. § 1985(3),[11] which creates a private cause of action against "two or more persons . . . [who] conspire . . . for the purposes of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws," 42 U.S.C. § 1985(3), a plaintiff must prove the following:

---

[9] Plaintiffs also repeatedly highlight two "letters" that Lioi wrote for Mr. Williams as evidence that Lioi conspired with Mr. Williams; however, these letters were requested by Mr. Williams upon his lawyer's advice, and there is nothing inaccurate regarding their contents.

[10] The court notes that Russell's alleged involvement in any "conspiracy" is less than Lioi's alleged involvement.

[11] The parties do not clarify whether Count 3 is brought pursuant to 42 U.S.C. §1985(1) or § 1985(3). I consider this count to be brought pursuant to § 1985(3), given the allegations in the complaint and discussion in the briefing.

(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 540 (D. Md. 2014) (citing *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011)). In order to prove a section 1985 conspiracy "a claimant must show an *agreement or a 'meeting of the minds'* by defendants *to violate the claimant's constitutional rights.*" *Id.* at 541 (citing *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)) (emphasis added). Furthermore, as the Fourth Circuit has clarified, this standard is "relatively stringent," and under this standard, courts "rarely, if ever, [find] that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." *Simmons*, 47 F.3d at 1377.

Defendants first argue these conspiracy claims fail because "agents of a government entity cannot conspire with each other" "under the 'intracorporate conspiracy doctrine[.]'" (Russell Mot. Summ. J. at p. 28, ECF No. 144–1). The intracorporate conspiracy doctrine, however, does not apply when actors perform "unauthorized acts." *Facey*, 992 F. Supp. at 536 (citing *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013)) (explaining the intracorporate conspiracy doctrine will not apply "where the agent's acts were not authorized by the corporation."). Assuming Russell or Lioi committed "unauthorized acts," an issue I do not decide, this defense would not assist defendants.

Regardless of whether the "intracorporate conspiracy doctrine" defense applies, plaintiffs have failed to set forth sufficient facts to establish their conspiracy counts. As an initial matter, § 1985 is inappropriate because Russell and Lioi were not "motivated by a[ny] specific class-based, invidiously discriminatory animus." Next, even assuming Russell and Lioi permitted Mr. Williams to delay his date of voluntary surrender until Tuesday, November 18, 2008, this does

23

not establish that the "defendants each conspired with the other to violate the constitutional rights of plaintiffs and the decedent and to proximately cause her death." (Am. Compl ¶ 66, ECF No. 87). Furthermore, both causes of action contain an element of causation. For example, regarding civil conspiracy, plaintiffs must establish that the "act or the means employed . . . *result[ed]* in damages to the plaintiff." *James B. Nutter & Co.*, 758 F.3d at 541 (quoting *Hoffman*, 867 A.2d at 290) (emphasis added). And the fourth element of a § 1985 claim requires that the conspiracy "*result[]* in injury to the plaintiff." *Facey*, 992 F. Supp. 2d at 540 (emphasis added). As discussed above, the evidence that any actions undertaken by Russell and Lioi resulted in Ms. Williams's murder is too speculative to support the plaintiffs' claim. Accordingly, the court will grant the defendants' motion for summary judgment on Counts 3 and 10.

### B. Gross Negligence (Count 7)

Defendants Russell and Lioi are entitled to summary judgment on plaintiffs' gross negligence claims. Under Maryland law, gross negligence is defined as:

> [A]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life . . . of another, and also implies a thoughtless disregard to the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully *only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.*

*Gray v. Kern*, 124 F. Supp. 3d 600, 611 (D. Md. 2015) (quoting *Marriott Corp. v. Chesapeake & Potomac Telephone Co. of Md.*, 723 A.2d 454, 462 (Md. Ct. Spec. App. 1998)) (emphasis added). In addition to proving defendants Russell and Lioi "inflict[ed] injury intentionally," or were "so utterly indifferent to the rights of [Ms. Williams] that [defendants acted] as if such rights did not exist," *id.*, plaintiffs must establish, "as with other negligence claims, [] a duty of care, a breach of that duty, and damages as a proximate cause of the breach." *Pasternak & Fidis,*

24

*P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015) (quoting *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 803 (D. Md. 2002)). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Cooper v. Rodriguez*, 118 A.3d 829, 846 (Md. 2015) (quoting *Taylor v. Harford Cnty. Dep't of Social Servs.*, 862 A.2d 1026, 1034 (Md. 2004)).

Defendants Russell and Lioi first argue they are entitled to "public official immunity" for their discretionary acts. "Common law public official immunity applies to 'public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties.'" *Cooper*, 118 A.3d at 848 (quoting *Houghton v. Forrest*, 989 A.2d 223, 227 (Md. 2010)). "If those three conditions are met, the public official enjoys a qualified immunity in the absence of 'malice.'" *Thomas v. City of Annapolis*, 688 A.2d 448, 454 (Md. Ct. Spec. App. 1997). Malice, in this context, requires a "deliberate, intentional, nonprivileged, non-legally justified act[,] or one committed with actual malice." *Id.* at 456. Here, Russell and Lioi meet the initial requirements for asserting public official immunity; both were public officials acting within the scope of their discretionary duties, and there is no evidence they acted with "malice." The Maryland Court of Appeals recently held, however, that "gross negligence is an exception to common law public official immunity" and that if a police officer "act[s] with gross negligence, [he or she] is not entitled to immunity under common law public official immunity." *Cooper*, 118 A.3d at 849. Accordingly, Russell and Lioi are not entitled to public official immunity if plaintiffs can establish a viable gross negligence claim against them.

Even if all genuine factual disputes are resolved in favor of plaintiffs, however, a reasonable factfinder could not conclude that Russell or Lioi were grossly negligent with respect to Ms. Williams. Despite plaintiffs' arguments to the contrary, they have provided no evidence that Russell or Lioi "inflicted injury intentionally" on Ms. Williams. *Gray v. Kern*, 124 F. Supp. 3d at 611. Furthermore, neither Russell nor Lioi acted "so utterly indifferent[ly] to the rights of [Ms. Williams] that [they acted] as if such rights did not exist." *Id.*

Additionally, the court finds plaintiffs' gross negligence claim fails on the causation element. To establish causation, plaintiffs must prove Russell and Lioi's "negligence was 'both a cause in fact of the injury and a legally cognizable cause.'" *Pasternak*, 95 F. Supp. 3d at 895 (citing *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 351 (D. Md. 2011)).

> The "cause in fact" inquiry "concerns whether defendant's negligent conduct actually produced an injury." Maryland courts consider two tests in determining whether causation-in-fact exists: the "but for" test and the substantial factor test. The "but for" test considers whether the injury would not have occurred absent defendant's negligent conduct. The substantial factor test applies in situations where more than one independent negligent act may be responsible for a plaintiff's injury. Under the substantial factor test, an action is viewed as the cause of an injury only if the action was a substantial factor in bringing about plaintiff's injury.

> The "legal causation" inquiry is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established. Commonly, this inquiry involves a determination of whether the injuries were a foreseeable result of the negligent conduct. ("In applying the test of foreseeability [or, legal causation] . . . it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where . . . it appears 'highly extraordinary' that the negligent conduct should have brought about the harm.").

*Id.* at 895 (citing *Casey,* 823 F. Supp. 2d at 351) (internal citations and quotation marks omitted).

Here, plaintiffs' gross negligence claim fails both the "cause in fact" and "legal causation" inquiries.

First, as discussed *supra,* it cannot be argued that Russell or Lioi caused the harm suffered by Ms. Williams by failing to ensure Mr. Williams's arrest. As Stanford O'Neill Franklin attested, Mr. Williams "would have been released within 24 hours on his personal recognizance," because "an established member of the community with local ties, no violent criminal history and no apparent danger to society is [generally] released on [his] personal recognizance." (Stanford O'Neill Franklin Aff. ¶¶ 53, ECF No. 144–13, Ex. 11). Therefore, even if Mr. Williams had been arrested when he initially surrendered himself at the Eastern District on Thursday, November 13, 2008—or any date prior during one of the "turn ups"—he would have been free the following Monday to attack Ms. Williams. Furthermore, such an argument relies on the assumption that Mr. Williams needed to be free on Monday, November 17, 2008, to murder his wife because that was the only day he knew of his wife's location (at the courthouse). However, there is evidence suggesting Mr. Williams knew where Ms. Williams was during this time period, which further suggests defendants did not "cause" the injury to Ms. Williams.

Next, even assuming Russell and Lioi purposely diverted the arrest warrant and purposely delayed Mr. Williams's voluntary surrender date, thereby allowing Mr. Williams to remain free until the day he murdered his wife, these actions still would not be the "but for" cause of Ms. Williams's death. Nor can it be argued these acts were a "substantial factor" in her death. Here, the "but for" cause or "substantial factor," simply put, was Mr. Williams's decision to murder his wife and his completion of that act. Furthermore, even assuming, *arguendo,* that

27

"cause in fact" is satisfied, "legal causation" is not. The fact that Mr. Williams eventually murdered his wife on Monday, November 17, 2008, was not a foreseeable result of any acts committed by Russell or Lioi. Given that Mr. Williams was willing to turn himself in voluntarily, there was no reason for Russell or Lioi to believe Mr. Williams would attack Ms. Williams, let alone murder her. None of Russell or Lioi's alleged acts was the proximate cause of Ms. Williams death; rather, the proximate cause was Mr. Williams's decisions and actions.

Accordingly, Russell and Lioi are entitled to summary judgment on plaintiffs' gross negligence claim because, in addition to failing to establish causation, plaintiffs have failed to provide evidence suggesting Russell or Lioi "inflicted injury intentionally" on Ms. Williams, *Gray v. Kern*, 124 F. Supp. 3d at 611, or that they acted "so utterly indifferent[ly] to the rights of [Ms. Williams] that [they acted] as if such rights did not exist," *id.*

### C. Reckless Endangerment (Count 8)

"Reckless endangerment is purely a statutory crime." *Holbrook v. State*, 772 A.2d 1240, 1246 (Md. 2001). Defendants argue this count fails as a matter of law because plaintiffs cannot impose civil liability on Russell and Lioi for alleged criminal activity. Plaintiffs do not respond to this argument, seemingly recognizing this count fails. Accordingly, the defendants are entitled to summary judgment on plaintiffs' reckless endangerment claim.

### D. Intentional Infliction of Emotional Distress (Count 9)

Defendants Russell and Lioi are entitled to summary judgment on plaintiffs' intentional infliction of emotional distress ("IIED") claims. Maryland courts have emphasized "[t]he tort of intentional infliction of emotional distress is rarely viable, and is 'to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct.'" *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995) (quoting *Kentucky Fried Chicken Nat.*

28

*Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11 (Md. 1992)). Furthermore, the "general rule that emerges from caselaw" is that "the requirements of the rule are rigorous, and difficult to satisfy." *Id.* citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 12, pp. 60–61 (5th ed. 1984). "A claim of IIED has four elements: (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe." *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 759 (D. Md. 2015); *see also Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977) (listing elements). Regarding the second element, the defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Khalifa v. Shannon*, 945 A.2d 1244, 1254 (Md. 2008) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

In this case, even assuming Russell's and Lioi's conduct was "intentional or reckless," plaintiffs' IIED claim fails. First, Russell's and Lioi's actions, construed in plaintiffs' favor, were not sufficiently "extreme and outrageous" to support an IIED claim. The facts presented, viewed in the light most favorable to plaintiffs, suggest that: (1) BCPD did not follow proper procedures for handling warrants, allegedly at Russell's instruction; (2) Russell and Lioi communicated with Mr. Williams via phone and text, predominantly for the purpose of scheduling his date of voluntary surrender; and (3) Russell and Lioi allowed Mr. Williams to leave the station on Thursday, November 13, 2008, when the arrest warrant could not be located, ultimately delaying his voluntary surrender date to Tuesday, November 18, 2008. None of these acts, viewed individually or together, are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Khalifa*, 945 A.2d at 1254 (citing *Harris v. Jones*, 380

A.2d at 614). Furthermore, this IIED claim fails on causation grounds as discussed *supra* in Section V(B). Accordingly, defendants Russell and Lioi are entitled to summary judgment on plaintiffs' IIED claim.

### E. Wrongful death and Survival Action (Counts 4 and 5)

"Under the Survival Act, the personal representative of an estate may bring 'a personal action which the decedent might have commenced or prosecuted' including an action 'against a tort-feasor for a wrong which resulted in the death of the decedent.'" *Littleton v. Prince George's Cty., Md.*, 797 F. Supp. 2d 648, 658 (D. Md. 2011), *aff'd in part, rev'd in part and remanded sub nom. Littleton v. Swonger*, 502 F. App'x 271 (4th Cir. 2012) (quoting Md. Code Ann., Est & Trusts § 7–401(y)(2008)). The survival action "arises from the tortious infliction of injury upon the victim" and "damages are measured in terms of *harm to the victim[.]*" *State v. Copes*, 927 A.2d 426, 434 (Md. Ct. Spec. App. 2007) (quoting *Benjamin v. Union Carbide Corp.*, 873 A.2d 463, 480 (Md. Ct. Spec. App. 2005)) (emphasis in original). In contrast, "[u]nder the Maryland Wrongful Death Act, a party may bring an action for wrongful death against a person 'whose wrongful act causes the death of another.'" *Littleton*, 797 F. Supp. 2d at 658 (citing Md. Code Ann., Cts. & Jud. Proc. § 3–902(a)). "An action under Maryland's wrongful death statute is separate, distinct, and independent from a survival action, even when those actions arise out of a common tortious act." *FutureCare NorthPoint, LLC v. Peeler*, 143 A.3d 191, 203 (Md. Ct. Spec. App. 2016). "A wrongful act is 'an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued.'" *Id.* at 204 (citing Md. Code Ann., Cts. & Jud. Proc. § 3–901(e)). "Therefore, a party may only prevail in either cause of action if it can show that the Defendant committed a wrongful act." *Littleton*, 797 F. Supp. 2d at 658. Furthermore, both causes of action require a

30

showing of causation. *See, e.g., Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012) (granting summary judgment because "[p]laintiffs [we]re unable to establish the causation element of their wrongful death claim with specific facts that would be admissible at trial).

Plaintiffs argue that "wrongful acts" include not only "negligent conduct (with its focus on a duty and corresponding breach), but also on intentional and other tortious misconduct including the constitutional claims at issue here." (Pl. Opp'n at 31, ECF No. 175–1). Even if plaintiffs' expansive view of "wrongful acts" is correct, they have failed to proffer evidence to support these other claims. Furthermore, ordinary negligence cannot serve as the basis for either claim, because Russell and Lioi are accorded public official immunity. *See Cooper*, 443 Md. at 680 (explaining that public officials are accorded immunity in cases of ordinary negligence). Lastly, these claims also would fail on the causation grounds discussed above. Accordingly, defendants Russell and Lioi are entitled to summary judgment on these two counts.

## CONCLUSION

For the above stated reasons, plaintiffs' Motion to Strike will be denied, Lioi's Cross-Motion to Modify Scheduling Order will be granted, and Lioi's and Russell's Motions for Summary Judgment on counts I, III–V, and VII–X, will be granted. A separate Order follows.

$\frac{6/30/17}{\text{Date}}$

Catherine C. Blake
United States District Judge

31